THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THEODORE KNOX, Defendant-Appellant.

Second District No. 2—91—0697

Opinion filed February 10, 1993.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan, and Jose J. Behar and Robert G. Tucker, both of Chapman & Cutler, of Chicago (William L. Browers and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

A jury convicted defendant, Theodore Knox, of two counts of first-degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1) and two counts of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2). The armed violence counts were vacated, and defendant was sentenced to natural-life imprisonment without parole for the first-degree murder convictions. On appeal, defendant contends that (1) evidence of his gang affiliation was irrelevant and prejudicial, resulting in an unfair trial; (2) the trial judge violated his right to counsel when advising defendant that he could not discuss his testimony with defense counsel during an overnight recess; and (3) the evidence to support his conviction was insufficient because it consisted primarily of testimony from jailhouse informants and a codefendant.

The charges stemmed from the February 17, 1988, shootings of Santos Escobedo and Domingo Garcia, Jr. (the victims). Defendant, Daniel Blalock, Sr., Daniel Blalock, Jr., Ronald Walker, and Oscar Parham called themselves the "Royal Family" (the family) and dealt drugs in Zion, Illinois. Defendant was a "soldier" in the gang and took orders from Blalock, Sr., and Parham.

Among the State's key witnesses was Walker, who testified in exchange for a plea of guilty to armed robbery with a 20-year sentence. He testified that defendant and he were soldiers in the family, which made money from drug sales. Blalock, Sr., authorized all actions by the family members. Walker identified the symbols "L.L.L.," meaning "love, loyalty and life," and a six-pointed star, both of which were family-related symbols.

On the morning of February 17, 1988, Walker had a court date in Waukegan, which he attended along with Blalock, Sr., Parham,

and defendant. After that, the group went to Parham's girlfriend's apartment, where they met up with Blalock, Jr. Defendant later told Blalock, Sr., that some guys outside wanted to sell them marijuana. Defendant sampled the marijuana. After the family decided to buy the marijuana, Walker retrieved a digital scale for Blalock, Sr. Then, defendant, Blalock, Jr., Parham and Blalock, Sr., went into an adjoining utility room to consummate the deal.

Walker testified that he remained in the apartment while the others went into the utility room. A few minutes later, Walker heard gunshots. Walker thought nothing of it because he frequently heard gunshots in that apartment building. Walker then heard defendant call his name in a panicky voice. Walker went inside the utility room and saw defendant struggling with a young Hispanic man. An older Hispanic man was lying on the floor with a hole in his head. Walker pulled the young Hispanic man off of defendant, and defendant shot the man in the back of the head. Defendant then shot each of the two men again in the head. Walker testified that no other family members were in the room and there were no drugs or marijuana in the room.

Walker further testified that before leaving the utility room he picked up the scale and a .22-caliber revolver. Defendant had a .38-caliber handgun. Defendant had been injured in the shooting and Walker helped dress the wound. The two men went back to the apartment and eventually fled to Chicago.

James Wellman, a man connected with the family, testified that he knew the family and admitted to being involved with them. Wellman explained the family hierarchy and the meaning of "L.L.L." He stated that he agreed to testify in exchange for intensive probation and alcohol treatment, instead of a prison term, on the petition to revoke his probation.

Wellman testified that in June or July 1988 he spoke with defendant in the Lake County jail. Defendant warned Wellman not to testify or he would end up dead. When Wellman assured defendant he would not testify, defendant told Wellman that the victims came to the apartment on the day in question to sell two pounds of marijuana. Defendant stated that the family was planning to steal it but not hurt anyone. Defendant claimed that he, Blalock, Sr., Parham, Walker, and Parham's girlfriend all had guns. Blalock, Sr., brought the men in and made the deal. After the family exchanged their money for the marijuana, they pulled out their guns and demanded the money be returned. When one of the victims pulled out a gun, the family members shot both victims and left.

David Caples, another man who hung around the family, testified after being promised that his robbery and aggravated battery charges would be dropped. He was to return to the Department of Corrections on a parole violation. The prosecution was going to send a letter on his behalf to the prisoner review board, which was to preside over Caples' parole hearing later that month.

Caples testified that he occasionally sold drugs for the family and that the family was associated with the Black Gangster Disciples street gang. The six-pointed star was symbolic of a larger gang network.

Caples further testified that he spoke with defendant at the Joliet Correctional Center in July 1989. Defendant told Caples that the victims were not narcs, but were "just dumb Mexicans." Walker was supposed to be a lookout while the rest of the family took the drugs from the victims.

The key witness for the defense was the defendant. He testified that he, Blalock, Sr., Walker and Blalock, Jr., went to court on the morning of February 17, 1988. Eventually they ended up at Parham's girlfriend's apartment. As defendant and Walker were walking to the alley, a car drove up next to them. One of the victims got out of the car and asked to see Blalock, Sr., to sell him some marijuana. Defendant denied that there was a set plan to buy marijuana from the victims. When the victim displayed the marijuana, Gary Hayes, who was hanging out in the alley, snatched the bag containing marijuana out of the victim's hands.

While Hayes and the victim argued over the marijuana, Blalock, Sr., came by, took the marijuana, and told the victim to "get the f--- out of here." The victim then drove away.

Later that day, defendant was in the utility room of the apartment building. The two victims came in and asked for the marijuana back. When defendant told them Blalock, Sr., was not there and "to get the f--- out of there," one of the victims pulled out a gun. Defendant then pulled out his gun, and one of the victims shot first. Defendant shot back, hitting one of the victims. After an exchange of gunfire, defendant yelled for Walker. Defendant claimed that Walker came in, picked up the gun one of the victims had dropped, and shot until no bullets remained in the gun, hitting the other victim.

Defendant and Walker went into Parham's girlfriend's apartment to run some water on defendant's hand, which had been injured in the gun battle. Before they left the building, Walker went back into the utility room alone to get defendant's ring and hat.

Defendant testified that he heard more shots from inside the utility room. Walker returned with a chrome gun in his hand, and the two men eventually fled to Chicago.

On cross-examination, defendant said Blalock, Sr., was like a father to him. The group called themselves the family because they were all like brothers, but defendant claimed he was unfamiliar with the family hierarchy. He admitted that he and Walker sold drugs. Defendant carried a .22 caliber with him because he "was young." Defendant denied that the family was affiliated with the Black Gangster Disciples street gang, but acknowledged that a six-pointed star, a symbol of that gang, was displayed in the window of Parham's girlfriend's apartment. Defendant further acknowledged that "L.L.L." meant life, love and loyalty.

Following cross-examination of defendant, the court recessed for the evening. The trial judge informed defendant not to discuss his testimony with anyone during the recess, including his attorneys. No objection was made and, the following day, defendant completed brief redirect and re-cross-examination.

The jury found defendant guilty of first-degree murder in the course of committing or attempting to commit robbery and guilty of armed violence. Defendant was sentenced to natural-life imprisonment without parole after his motion for judgment notwithstanding the verdict or, alternatively, for a new trial was denied. Defendant then filed a timely appeal.

## EVIDENCE OF GANG MEMBERSHIP

At issue is whether the evidence of defendant's gang membership was so prejudicial that its admission denied defendant a fair trial. Defendant contends that evidence about the family and the Black Gangster Disciples was not admissible to show the purpose or motive for the crime. He claims that the prejudicial effect of this evidence outweighed its probative value. Defendant also argues that the prosecutor acknowledged that the shootings were not the result of a dispute between rival gangs. Additionally, defendant argues that this issue has not been waived and asks this court not to follow its recent decision in *People v. Pantoja* (1992), 231 Ill. App. 3d 351.

The State contends that *Pantoja* is applicable here and that this issue has been waived because defendant failed to object to the admission of gang-related evidence at trial, after defendant's motion *in limine* had been denied. Alternatively, the State argues that evi-

dence of gang membership was relevant and admissible because it was related to the crime at issue.

We first address the issue of waiver. In *Pantoja*, we held that a movant whose motion *in limine* has been denied should object when that evidence is presented at trial so as to preserve the issue for appellate review. (231 Ill. App. 3d at 354.) Defendant claims that *Pantoja* should not apply because this court failed to cite *People v. Smith* (1990), 141 Ill. 2d 40. However, *Smith* does not discuss the applicability of the waiver rule after a motion *in limine* has been granted or denied. A motion *in limine* to exclude gang-related evidence was not made by the defendant in *Smith*. Thus, we question its applicability to the waiver discussion in *Pantoja*.

■■ We continue to follow the waiver rule in *Pantoja*, but find it should not be followed here. When the prosecution attempted to admit photographs of defendant and others flashing gang signs and of a birthday cake displaying gang symbols, defense counsel objected. This objection to gang-related evidence is the type of objection contemplated in *Pantoja*. We find that this objection preserved the issue for review.

Evidence relating to the defendant's gang membership or gang-related activities is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*Smith*, 141 Ill. 2d at 58.) The evidence is only admissible where there is sufficient proof that gang membership or activity is related to the crime charged. (*Smith*, 141 Ill. 2d at 58.) Relevant evidence of gang membership is not inadmissible simply because prejudice attaches to that information. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 489.) Absent an abuse of discretion, a reviewing court will not reverse the trial court's ruling denying defendant's motion *in limine* to exclude such evidence. *Pantoja*, 231 Ill. App. 3d at 353.

Before trial, the trial judge denied defendant's motion *in limine*, stating:

"As to the motion which applies to the gangs, I will deny the motion. Certainly, there is accountability that is perhaps a portion of this case."

The prosecutor had argued that gang affiliation was relevant because the five codefendants were acting in concert and the accountability theory could apply. Also, the prosecution argued that the gang relationship among the parties was relevant to show the motive for the drug deal and the armed robbery, which resulted in the victims' murders.

Although motive is not an essential element of the crime of murder, evidence which tends to show that the accused had a motive to kill the victim is relevant because it renders it more probable that the accused killed the victim. (*Smith*, 141 Ill. 2d at 56.) Here, the State was attempting to prove that defendant's motive for the murders was to advance the gang-related goals of dealing drugs and robbing other drug dealers. Such a motive rendered it more probable that defendant committed the murders. The murders were inexplicable absent evidence about the family and its drug network. Thus, we hold that the trial judge did not abuse his discretion in allowing evidence of gang affiliation.

In his brief, defendant primarily relies on *Smith* (141 Ill. 2d 40). There, our supreme court held that the admission of gang membership was improper because there was little evidence to support the motive theory that the killings were gang related. (141 Ill. 2d at 58-59.) The court stated that "it is not enough that the State merely produce evidence of motive in the abstract * * *. The motive must be attributable to the defendant on trial at the time the crime was committed." 141 Ill. 2d at 57.

In the case at bar, there was sufficient evidence to tie defendant in with the family at the time the crime was committed. A member of the family and others familiar with the family testified about defendant's role with the gang. There was also testimony that the family had decided to rob the victims during the drug deal. This evidence provides a sufficient basis for the State's motive theory and makes *Smith* distinguishable on its facts.

## RIGHT TO COUNSEL DURING OVERNIGHT RECESS

Defendant's second contention is that the trial judge violated defendant's right to counsel when informing defendant that he could not talk with his attorney about his testimony during the overnight recess. The trial judge gave this instruction after defendant had completed direct examination and cross-examination. Defendant claims that this prevented him from consulting with his attorney about *anything* over the evening recess.

The State contends that defendant has waived this issue by failing to object either at trial or in his post-trial motion. Alternatively, the State claims that defendant's right to counsel was not infringed upon because defendant did not show that he sought to exercise the right during the overnight recess. Further, the trial judge only ordered that defendant refrain from discussing his testi-

mony; it was not a blanket order that prevented all consultation between defendant and his attorney.

While it is generally true that defendant must object at trial and include the objection in a post-trial motion to preserve an issue for review (*People v. Burrows* (1992), 148 Ill. 2d 196, 229), a reviewing court may consider an unobjected-to error under the plain error rule. (134 Ill. 2d R. 615(a).) We will ignore the waiver rule here because the alleged infringement on the right to counsel is so fundamental that the defendant may have been denied a fair trial. See *People v. Herrett* (1990), 137 Ill. 2d 195, 209-10.

We begin our discussion with *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330, the case principally relied upon by defendant. In *Geders*, the defendant had finished direct examination when the trial judge called for an overnight recess. When the trial judge informed the defendant not to speak with his attorney during the recess, defense counsel objected. (*Geders*, 425 U.S. at 81-82, 47 L. Ed. 2d at 595, 96 S. Ct. at 1332.) Even though defense counsel assured the court that defendant's testimony would not be discussed during the recess, the trial judge said he thought "it [was] better that he not talk to you about anything." (Emphasis omitted.) *Geders*, 425 U.S. at 83 n.1, 47 L. Ed. 2d at 596 n.1, 96 S. Ct. at 1333 n.1.

The Supreme Court recognized that an overnight recess is often times a period of "intensive work, with tactical decisions to be made and strategies to be reviewed. *** At the very least, the overnight recess during trial gives the defendant a chance to discuss with counsel the significance of the day's events." (*Geders*, 425 U.S. at 88, 47 L. Ed. 2d at 599, 96 S. Ct. at 1335.) The Court suggested that the possibility of "coaching" could be avoided if the trial judge arranged "the sequence of testimony so that direct- and cross-examination of a witness will be completed without interruption." (425 U.S. at 89-90, 47 L. Ed. 2d at 600, 96 S. Ct. at 1336.) Thus, the Supreme Court held that the trial judge's order impinged upon the defendant's sixth amendment right to the assistance of counsel. 425 U.S. at 91, 47 L. Ed. 2d at 601, 96 S. Ct. at 1337.

We believe the *Geders* case is factually distinguishable for two reasons. First, the trial judge's order in *Geders* prohibited any discussion between the defendant and his attorney. Second, the defendant in *Geders* had not been cross-examined before the overnight recess, which would allow for greater "coaching" of the witness-defendant. In fact, the Court in *Geders* suggested that courts could avoid the "coaching" problem by recessing after cross-

examination, the exact situation that occurred here. We find *Geders* to be limited to its particular facts.

In *Perry v. Leeke* (1989), 488 U.S. 272, 102 L. Ed. 2d 624, 109 S. Ct. 594, the trial judge declared a 15-minute recess after the defendant completed direct examination. The judge also ordered that the petitioner "not be allowed to talk to anyone, including his lawyer, during the break." (*Leeke*, 488 U.S. at 274, 102 L. Ed. 2d at 629, 109 S. Ct. at 596.) Leeke moved for a mistrial when the trial resumed, which was denied. (*Leeke*, 488 U.S. at 274, 102 L. Ed. 2d at 629, 109 S. Ct. at 596.) The Supreme Court held that a trial judge may prevent a party from consulting with his or her lawyer while the party's testimony is in process if a brief recess is needed. (*Leeke*, 488 U.S. at 284-85, 102 L. Ed. 2d at 636, 109 S. Ct. at 602.) The Court noted that *Geders* was a different situation because attorney and client normally confer during an overnight recess, and stated:

> "It is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess." *Leeke*, 488 U.S. at 284-85, 102 L. Ed. 2d at 636, 109 S. Ct. at 602.

The Illinois courts have also addressed this issue in a few cases. In *People v. Stewart* (1987), 161 Ill. App. 3d 99, the defendant was placed in an isolation cell during the overnight recess because of fears he would harm himself. This court held that the defendant's sixth amendment right to counsel was not violated by this action because there was no evidence that the defendant attempted to contact or was prevented from contacting his lawyer while in the cell. *Stewart*, 161 Ill. App. 3d at 103.

In *People v. Brooks* (1987), 115 Ill. 2d 510, a lunch recess was called at the conclusion of defendant's direct examination. The trial court sequestered the defendant during the break. (115 Ill. 2d at 518-19.) Our supreme court held that the defendant was not deprived of the assistance of counsel because no objection was made and neither defendant nor her counsel referred to the order after the break. There was no evidence that the defendant wished to communicate with her attorneys during that period. *Brooks*, 115 Ill. 2d at 520-21.

Finally, in *People v. Noble* (1969), 42 Ill. 2d 425, the case most similar factually to the one at bar, the trial court adjourned at 5 p.m., during defendant's cross-examination. The trial judge warned the defendant not "to discuss his testimony with anyone including his attorney." (*Noble*, 42 Ill. 2d at 429.) Defense counsel protested

and his motion for mistrial was denied. The supreme court held that this action constituted a denial of the assistance of counsel guaranteed by the sixth amendment. It was apparent to the court "from the colloquy between the court and counsel that any discussion between counsel and defendant must wait until *** the completion of defendant's testimony." *Noble*, 42 Ill. 2d at 429.

■ The obvious distinction between these cases is situations where the recess was overnight versus situations where the recess was shorter. However, the difference between these cases that we find most significant is situations where defense counsel objected to the court's sequestration order versus situations where no objection was made. (See *People v. Moore* (1984), 128 Ill. App. 3d 505, 516; *People v. Seider* (1981), 98 Ill. App. 3d 175, 189.) The key question in deciding whether a defendant was deprived of counsel is whether the defendant was prevented from consulting with his or her lawyer. (See *Brooks*, 115 Ill. 2d at 520-21.) Here, defendant, through his attorney, did not object when the trial judge admonished him not to discuss his testimony with anyone, including his attorney. The following day, defense counsel did not mention the order or move for a mistrial. Defense counsel's actions do not suggest that defendant and his attorney believed they were unable to consult about strategic matters during the overnight recess.

Although no objection was made after the trial judge's admonition, defendant wishes us to assume that he was deprived of his right to counsel. We will make no such assumption. The trial judge's admonition was brief and limited to defendant's testimony, which could not be significantly altered after direct examination and cross-examination were completed. Thus, we hold that defendant was not deprived of his sixth amendment right to the assistance of counsel.

### SUFFICIENCY OF THE EVIDENCE

The final issue to address is whether the testimony of jailhouse informants and a codefendant was sufficient to prove defendant guilty of first-degree murder. Defendant contends that the "only" support for the convictions of first-degree murder in the course of an attempt to commit robbery was testimony from witnesses whose credibility was suspect. All three witnesses bargained with the State in exchange for their testimony. Defendant argues that their testimony should not be accepted unless it carries with it the absolute conviction of truth.

A criminal conviction will not be set aside on review unless the evidence was so unsatisfactory as to create a reasonable doubt of the defendant's guilt. (*People v. Burrows*, 148 Ill. 2d at 224.) The key question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Frieberg* (1992), 147 Ill. 2d 326, 360.) It is the jury's function to weigh the credibility of the witnesses and resolve the inconsistencies in the testimony. *Frieberg*, 147 Ill. 2d at 360.

The uncorroborated testimony of an accomplice can be sufficient evidence on which the fact finder may base a conviction. (*People v. Holmes* (1990), 141 Ill. 2d 204, 242.) However, this testimony should be "cautiously scrutinized on appeal." (*Holmes*, 141 Ill. 2d at 242.) Similarly, when a witness has hopes of being rewarded for his or her testimony, the testimony should not be accepted unless it has the absolute conviction of truth. *People v. Williams* (1976), 65 Ill. 2d 258, 267.

■ We have reviewed the record and find no reason to reverse defendant's conviction. Walker, the codefendant, and James Wellman, a jailhouse informer, placed defendant at the crime scene, although their versions of the shooting were different. Both Wellman and David Caples, the other jailhouse informant, testified that defendant acknowledged that there was a plan to rob the victims. Although each witness received consideration for testifying in this case, we do not doubt that each witness' testimony carried "the absolute conviction of truth."

Moreover, we find the cases relied upon by defendant to be distinguishable. In *Williams*, a convicted codefendant testified in exchange for his *immediate* release from prison, where he had served only two years of a 15- to 30-year prison sentence for the same crime for which the defendant was on trial. (*Williams*, 65 Ill. 2d at 264-65.) The convicted codefendant also admitted to lying at his own trial and had admitted to making several material statements under oath that were patently inconsistent. (*Williams*, 65 Ill. 2d at 267.) Here, the deals the codefendant and the jailhouse informers made with the State do not inherently affect the credibility of their testimony.

In *People v. Ash* (1984), 102 Ill. 2d 485, an accomplice testified against the defendant after pleading guilty to armed robbery and after the State agreed to dismiss the remaining charges against him. (*Ash*, 102 Ill. 2d at 488.) The accomplice also wanted to avoid being sent to the same prison as his codefendants because they had

a contract out on his life. He acknowledged that he would lie to save his life. (*Ash,* 102 Ill. 2d at 491, 493.) The witnesses here did not display an overt fear of the defendant such that their credibility should be scrutinized on review. The jury was aware of the deals struck by the witnesses, and it was within the province of the jury to decide who was to be believed.

Finally, we note that defendant believed that, based on the jury's notes to the trial judge during deliberations, the jury "felt constrained" to return verdicts of guilty as to first-degree murder. There is no support for this hypothesis, and we will not entertain such speculation. We hold that there was sufficient evidence to convict defendant of first-degree murder.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

UNVERZAGT and BOWMAN, JJ., concur.