# Illinois Official Reports

## Appellate Court

*People v. Jaimes*, 2014 IL App (2d) 121368

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICARDO JAIMES, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-1368 |
| Filed<br>Modified upon denial<br>of rehearing | November 6, 2014<br><br>February 10, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first-degree murder and attempted first-degree murder were upheld over his contentions that his guilt was not established beyond a reasonable doubt, that gang-related evidence was improperly admitted and that his counsel was ineffective, since the evidence established that defendant's vehicle was at the shooting and defendant was driving, an eyewitness had sufficient opportunity to view defendant, the jury could conclude beyond a reasonable doubt that defendant was guilty under a theory of accountability, the handling of the murder victim's dying declaration as to who shot him did not deprive defendant of a fair trial, the admission of gang-related evidence was not an abuse of discretion, and defense counsel was not ineffective in adopting a strategy that involved presenting evidence that supported the State's case. |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 10-CF-1621; the Hon. John R. Truitt, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Amanda N. Graham, of Amanda Graham Law, LLC, of Chicago, for appellant.

Joseph P. Bruscato, State's Attorney, of Rockford (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Jorgensen and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a jury trial, the defendant, Ricardo Jaimes, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)). He was sentenced to a total of 70 years' imprisonment. On appeal, the defendant argues that: (1) he was not convicted beyond a reasonable doubt; (2) the trial court erred in admitting gang-related evidence; and (3) he was deprived of the effective assistance of counsel. We affirm.

¶ 2                                      BACKGROUND
¶ 3        On June 23, 2010, the defendant and his brother Isaac were charged by indictment with the first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2), (a)(3) (West 2010)) of Demarkis Robinson and the attempted first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010)) of William Patrick. The trial court granted the defendant's motion to sever the brothers' trials.

¶ 4        Between September 24 and 27, 2012, the trial court conducted a jury trial. The State's evidence established that Patrick had prior convictions of mob action and possession of a firearm without a firearm owner's identification (FOID) card and that he was a member of the Insane Unknowns street gang. That gang was a rival of the Latin Kings. Robinson was his close friend and also a member of the Insane Unknowns.

¶ 5        On May 27, 2010, Patrick and his aunt, Wanda Perez, were visiting his grandmother's house at 1129 6th Avenue in Rockford. Robinson was also there. Robinson spent time on the front porch with Patrick, Perez, and other family members. While on the porch, Perez noticed a gray Tahoe sport utility vehicle (SUV) quickly approach and then stop near the 8th Street and 6th Avenue intersection. Because its approach grabbed her attention, she told Patrick and Robinson to watch the SUV. Patrick watched it drive past the house slowly, with the driver's side of the vehicle facing the house. Perez momentarily played with her phone, but when she looked up she noticed the driver make a hand gesture with two fingers pointing downward. Perez did not closely view the vehicle's occupants. Perez believed that the gesture was a gang

sign. Both Robinson and Patrick were present when the gesture was made. Patrick explained that the hand gesture was an act of disrespect to the Insane Unknowns. Then, Patrick observed the driver display a gang sign for the Latin Kings. Patrick testified that the driver's hand gestures were grounds to start a fight.

¶ 6        Patrick took his nieces into the house because "anything could start to happen." The Tahoe was traveling toward 7th Street, but Robinson and Patrick walked toward 9th Street. Shortly after Robinson and Patrick left, Perez heard what sounded like one close gunshot. She then called Robinson's father, Samuel, and told him that she heard a gunshot and that Robinson and Patrick were running toward his house. The call was made at 3 p.m.

¶ 7        Patrick and Robinson passed through an alley and turned onto 5th Avenue. When they exited the alley 15 to 20 minutes after first seeing the Tahoe, Patrick, while speaking on his phone, saw the Tahoe, with the same driver, pass them very slowly. Patrick observed that the passenger had a bandana around his face, which signified to Patrick that the occupants of the Tahoe were going to start shooting. Patrick picked up a brick and threw it at the Tahoe so that it would keep moving. Geraldine Horton was walking by as this occurred. (Horton had previously been convicted of drug-related charges and she had other charges pending against her.) She heard glass break and saw the SUV stop a few feet before a stop sign. Lacressa Dangel was driving by as this occurred. (Dangel had previously been convicted of prostitution, theft, and drug-related charges. She also had traffic charges pending against her.) Dangel felt and saw something hit the back of her car on her northbound journey along 9th Street, between 2:45 and 3 p.m. She stopped her car north of 5th Avenue and saw a silver SUV facing west on 5th Avenue. She observed the scene unfold through her rearview mirror.

¶ 8        Horton, Patrick, and Dangel watched as: (1) the Tahoe's passenger door opened; (2) a passenger exited and walked toward the back of the vehicle; and (3) the passenger used two hands to hold, point, and fire a firearm four or five times. Dangel believed that the gun looked like a skinny BB gun and that the shooter was a Hispanic male. Patrick believed that the firearm looked like a rifle, and he heard five to eight shots fired. He ducked behind a tree, and Robinson veered off into an alleyway.

¶ 9        After the passenger stopped firing, he returned inside the waiting vehicle, and the vehicle sped off down 5th Avenue. Horton saw the driver as he passed; his eyes were wide open, and he gripped the steering wheel with locked and tensed arms. Horton later told the police that the driver looked scared. At trial, she testified that the driver was surprised to see her. She described both the driver and the passenger as Hispanic.

¶ 10        In response to the phone call from Perez, Samuel ran toward the area where the shots were fired. About 15 to 20 minutes later, Samuel found Robinson's shirt and then saw Robinson lying naked under a faucet. Samuel picked up the clothing from the yard and brought it to his son. Samuel saw that Robinson was in and out of consciousness and he called 911. Robinson then told Samuel, "that damn Richard shot me." From a previous discussion with his son, Samuel had learned that Richard and Robinson had been in a fight at Rockford East High School, Richard was a Latin King who attended East High School, and Robinson had encountered Richard at Perez's mother's house a month before the shooting.

¶ 11        Police officers responded to the scene and discovered five spent .22-caliber shell casings in the street. The casings were run over and deformed, but they were in a small grouping. Robinson was transported to Swedish American Hospital, where he was pronounced dead.

¶ 12    On May 28, 2010, Dr. Mark Peters performed an autopsy on Robinson. Dr. Peters opined that Robinson died of a gunshot wound to the abdomen that caused internal bleeding, hemorrhagic shock, and blood loss. Though such an injury could cause instant death, a person could walk and live with such an injury for 30 minutes before dying. Dr. Peters recovered from Robinson's body a bullet that appeared consistent with .22-caliber ammunition.

¶ 13    On May 28, 2010, Patrick spoke to Rockford police officers about the incident and gave his statement. He was upset, shaking, and crying. In his statement, Patrick did not mention that he threw a brick at the silver Tahoe or that Robinson walked up to the vehicle and spoke to the occupants. Though he had not seen the driver before, Patrick knew that the driver was a Latin King, based upon the display of the Latin Kings' gang sign. From a photo array, Patrick identified the defendant as the driver of the Tahoe and Isaac as the shooter.

¶ 14    Also on May 28, 2010, Rockford police officers interviewed Dangel. She identified Isaac as the shooter. She was not able to identify the driver of the vehicle.

¶ 15    On May 29, 2010, the police arrested both the defendant and Isaac. The police discovered the defendant's Tahoe at the house where he was arrested. When the Tahoe was inspected, the police found a spent .22-caliber casing under the rear passenger seat.

¶ 16    Patrick and Perez subsequently identified the defendant's Tahoe as the one they saw on the day of the shooting. Both Horton and Dangel told the police that the defendant's Tahoe looked like the one involved in the shooting.

¶ 17    Illinois State Police forensic scientist David Welte compared the five spent cartridges found on the street with the one found in the Tahoe. He concluded that all six casings were fired from the same .22-caliber firearm. Although he determined that the bullet recovered from Robinson was the same caliber as the six casings, he could not determine if it was fired from the same firearm, because, as the firearm used in the shooting was never recovered, he was not able to compare it to that firearm.

¶ 18    On February 7, 2011, Patrick went to the office of the defendant's attorney, David Vella. He was accompanied by someone who identified himself as a Vice Lord from Chicago. Patrick told Vella that the written statement he had given to the police was false and that he had laughed when it was read. He told Vella that he could not identify the driver or the shooter, because hoods and masks covered their faces. At trial, Patrick testified that his statement to Vella was false and that he had made it because he had been threatened.

¶ 19    In September 2012, Patrick told an assistant State's Attorney that he did not want to testify. Patrick explained that people had threatened him. He was concerned about his safety. Patrick indicated that he could still identify the driver of the Tahoe from a photo array, but not the shooter. (At trial, he testified that he could identify the shooter as well.) Patrick also made no reference to Robinson talking to the occupants of the Tahoe. (At trial, he testified that Robinson and the occupants said a couple of words when the vehicle first pulled up.)

¶ 20    The State introduced evidence that the defendant was a Latin King. Specifically, Gary Anderson, a Winnebago County corrections officer, said that the defendant told him that he was a Latin King and that he needed to be segregated from other gangs. The State also introduced testimony from Rockford police officer Marc Posley, an expert on street gangs. He explained the significance of gang members' hand gestures and their rivalries with other gangs.

¶ 21    Following the denial of his motion for a directed verdict, the defendant presented two witnesses. Rockford police officer Courtney Tillman Listhrup, a school liaison officer at East High School, testified that on May 14, 2010, Isaac complained to her that someone had broken the driver's-side and rear windows of his Chevy Suburban. Officer Jeffrey Schroder was called to impeach Patrick's testimony.

¶ 22    At the close of the trial, the jury found the defendant guilty of first-degree murder and attempted first-degree murder. Following the denial of his posttrial motion, the trial court sentenced the defendant to a total of 70 years' imprisonment. The defendant thereafter filed a timely notice of appeal.

¶ 23                                    ANALYSIS

¶ 24    The defendant's first contention on appeal is that he was not convicted beyond a reasonable doubt. Specifically, the defendant argues that the State failed to prove that he was present at the shooting or that he possessed the requisite intent for convictions of the charged offenses.

¶ 25    It is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The sufficiency of the evidence and the relative weight and credibility to be given the testimony of the witnesses are considerations within the exclusive jurisdiction of the fact finder." *People v. Atherton*, 406 Ill. App. 3d 598, 608 (2010). The evaluation of the testimony and the resolution of any conflicts or inconsistencies that appear are also wholly within the province of the finder of fact. *Collins*, 106 Ill. 2d at 261-62.

¶ 26    The offense of first-degree murder is shown when the State proves, beyond a reasonable doubt, that, in performing the acts that cause the death of an individual, the defendant "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2010).

¶ 27    The offense of attempted murder is shown when the State proves, beyond a reasonable doubt, that the defendant, with the specific intent to kill, commits any act that constitutes a substantial step toward the commission of murder. 720 ILCS 5/8-4, 9-1 (West 2010). The question of a defendant's intent is one of fact, to be determined by the trier of fact, and can be inferred from the surrounding circumstances, such as the character of the attack, the use of a deadly weapon, and the severity of injury. *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004).

¶ 28    Considering the evidence in the light most favorable to the State, we first address whether the evidence established that the defendant was the driver of the vehicle involved in the shooting. We believe that it did. Patrick identified the defendant as the driver, one day after the murder and at trial. Patrick and Dangel identified Isaac as the passenger. Patrick and Perez identified the defendant's vehicle as the one involved in the shooting. Horton and Dangel indicated that the defendant's vehicle looked similar to the one involved in the shooting. Further, a shell casing found in the defendant's vehicle matched the casings recovered at the crime scene. Based on this evidence, the jury could reasonably conclude that (1) the defendant's vehicle was at the shooting; (2) Isaac was the passenger in the vehicle; and (3) the defendant was driving the vehicle.

¶ 29    In so ruling, we reject the defendant's argument that, because Patrick gave numerous accounts as to what occurred, and because of his bias against the Latin Kings, his testimony was not credible. We note that all of the inconsistencies in his statements as well as his bias against the Latin Kings were brought to the jury's attention. Further, other than the statement that he made to Vella, which the circumstances suggest was made under duress, he consistently identified the defendant as the driver of the vehicle. It was within the purview of the jury to determine that Patrick's identification of the defendant was credible. See *Collins*, 106 Ill. 2d at 261-62.

¶ 30    We also reject the defendant's argument that Patrick did not have a sufficient opportunity to observe who was driving the vehicle. In assessing identification testimony, a court considers the following factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). The trier of fact determines the weight to be given identification testimony. *People v. Calderon*, 369 Ill. App. 3d 221, 232 (2006).

¶ 31    As to the first factor, Patrick twice encountered the defendant in daylight on a "hot, nice day." When the defendant first drove past Patrick and Robinson, the driver's side of the vehicle faced them and the windows were rolled down. Patrick saw the driver flash gang signs. Around 2:45 p.m., as Patrick exited the alley onto 5th Avenue while speaking on his phone, he saw the Tahoe, with the same driver, slowly passing again. Thus, Patrick's testimony demonstrated that he observed the defendant prior to the shooting without any obstruction. See *People v. Masse*, 237 Ill. App. 3d 348, 354 (1992). Because Patrick had two chances to see the defendant in broad daylight, the jury could reasonably conclude that Patrick had a sufficient opportunity to observe the defendant.

¶ 32    As to the second factor, the defendant argues that Patrick's degree of attention was insufficient to allow him to make a positive identification of the defendant. Specifically, the defendant contends that Patrick's cell phone use distracted him during the shooting. We note that, although Patrick was using his cell phone during his second encounter with the vehicle, he was not using it during the first encounter, when he observed the vehicle from the porch. The jury could conclude that Patrick was paying sufficient attention to what was occurring so as to identify the defendant.

¶ 33    As to the third factor–the accuracy of the witness's description–there was no detailed testimony. The record indicates only that Patrick described the events to police officers a day after the shooting.

¶ 34    As to the fourth factor–the witness's level of certainty–we note that Patrick identified the defendant one day after the incident and again at trial. The defendant asserts that Patrick's identification was uncertain, because his identification statements equivocated during the two-year span before trial. However, the only time that Patrick could not identify the defendant was when he gave a statement of recantation to Vella. Recantation statements are highly suspect and unreliable. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). As such, the jury was free to reject Patrick's recantation statement and find sufficient certainty from his other statements and his trial testimony.

¶ 35    Finally, as to the fifth factor–the length of time between the crime and the identification–Patrick identified the defendant only one day after the murder occurred. This clearly supports a finding that the identification was valid. *Cf. Slim*, 127 Ill. 2d at 313 (determining that identification made 11 days after crime supported finding that identification was valid).

¶ 36    We next address the defendant's argument that the State failed to prove the defendant accountable for the offenses because it failed to present any evidence that the defendant intended to aid and abet a murder and an attempted murder.

¶ 37    To sustain a conviction based upon an accountability theory, the State must establish that the defendant: (1) solicited, ordered, abetted, or agreed or attempted to aid another in the planning or commission of the offense; (2) participated before or during the commission of the offense; and (3) had the concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5-2(c) (West 2010); *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 33. To prove intent, the State must present evidence that the defendant shared the criminal intent of the principal or that there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 38    While mere presence at the scene of a crime, alone, does not render a person accountable, it is a factor that may be considered with other circumstances when the trier of fact determines accountability. 720 ILCS 5/5-2(c) (West 2010). Other factors that may be considered are the maintenance of a close affiliation with the companion after the commission of the crime, flight from the scene, and the failure to report the crime. *Craigen*, 2013 IL App (2d) 111300, ¶ 33. Active participation in the offense is not a requirement for guilt under a theory of accountability. *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). A jury can infer a defendant's accountability from his approving presence at the scene of the crime and from evidence of conduct showing a design on the defendant's part to aid in the offense. *People v. Tinoco*, 185 Ill. App. 3d 816, 823 (1989). Further, to obtain a conviction based on accountability, the State must prove that the principal actually committed the offense. *People v. Chirchirillo*, 393 Ill. App. 3d 916, 922 (2009).

¶ 39    Again, taking the evidence in the light most favorable to the State, we believe that the jury could conclude beyond a reasonable doubt that the defendant was guilty of murder and attempted murder under a theory of accountability. The evidence indicates that the defendant instigated the altercation when he disparaged the gang that Robinson and Patrick were in. Based on Samuel's testimony, the jury could find that the defendant knew that Robinson was in a rival gang and that Robinson would find his hand gestures insulting. Patrick explained that the defendant's actions indicated that he was looking to start a fight. Consistent with this perceived desire to start a fight, the defendant was driving very slowly while Isaac was wearing a bandana around his face and holding a rifle. Patrick explained that Isaac's wearing the bandana indicated that he was about to start shooting. After Patrick threw a brick at the defendant's vehicle, the defendant stopped abruptly, which allowed Isaac to get out of the vehicle and shoot at both Robinson and Patrick. The defendant drove away quickly after Isaac returned to the vehicle. Based on all of this evidence, the jury could reasonably infer that the defendant intended to aid and abet the murder of Robinson and the attempted murder of Patrick.

¶ 40    In so ruling, we note that the defendant correctly points out that flashing gang symbols does not by itself establish an intent to commit a crime. See *People v. Gonzalez*, 142 Ill. 2d

481, 485 (1991) (citing instances of flashing gang symbols that did not immediately precede violent altercations). Similarly, a defendant's knowledge that his passenger has a gun does not establish by itself that the defendant approved of his passenger using that gun to commit a crime. See *People v. Taylor*, 186 Ill. 2d 439, 448 (1999) (driver found not guilty of aggravated discharge of a firearm even when he knew that his passenger had a gun). However, in *Gonzalez* and *Taylor*, the defendants' actions were much less indicative of an intent to assist with the commission of a crime. As set forth above, considering the totality of the defendant's conduct in this case, the jury could infer that the defendant aided and abetted Isaac in committing the charged crimes.

¶ 41    The defendant further argues that the State did not establish that he and Isaac were acting in concert, because it did not establish that Isaac was in a gang. The defendant contends that, as Isaac was the alleged principal in a "gang-related" shooting, Isaac's lack of gang status was relevant. Because there was no evidence that Isaac was a gang member, the defendant insists that there is absolutely nothing that proves that he should have known that Isaac intended to step out of the Tahoe and shoot at two people who were not his rivals.

¶ 42    Although the record does not establish that Isaac and the defendant were in the same gang, the evidence does establish that the defendant and Isaac are brothers. The jury could reasonably infer that Isaac and the defendant's familial relationship was a basis for them to work in concert. Moreover, even absent a shared gang affiliation, there was other evidence that suggested that the defendant was aware of and approved of Isaac's plan to shoot at the victims. As described above, the defendant instigated the altercation by flashing provocative gang symbols at the victims. Shortly thereafter, the defendant was slowly driving by the victims while Isaac was wearing a bandana across his face and was armed with a rifle. It would be counter to human experience for the jury to conclude that the defendant was not aware that Isaac was about to commit a crime. See *People v. Calahan*, 272 Ill. App. 3d 293, 299-300 (1995) (explaining that it is a well-recognized aspect of criminal conduct that the perpetrator will seek to conceal his identity). The defendant gave Isaac an opportunity to shoot at the victims when he stopped his vehicle abruptly. He then fled from the scene and did not report the crime. These circumstances support a finding that the defendant was accountable for Isaac's actions.

¶ 43    The defendant also emphasizes that one cannot be found guilty on a theory of accountability if the principal is not guilty. See *Chirchirillo*, 393 Ill. App. 3d at 922. He points out that Isaac was acquitted of the charged offenses. However, just because a different jury acquitted Isaac does not mean that the jury in the instant case could not find that he was in fact the shooter. *Cf. People v. Martinez*, 389 Ill. App. 3d 413, 418 (2009) (acquittal of a codefendant does not establish the defendant's innocence and should not be given conclusive effect against the State in favor of a stranger to that trial).

¶ 44    Further, the defendant points out that, after the shooting, Horton described the driver as appearing scared. The defendant argues that the logical inference from this observation was that the driver was scared at what the shooter was doing and that he did not acquiesce in the shooter's actions. An equally plausible inference, however, was that the driver was scared or surprised at seeing someone who might be able to identify him later as having been involved in the crime. Of course, it was for the jury to determine which of these competing inferences was correct. *People v. Janik*, 127 Ill. 2d 390, 401 (1989).

¶ 45    The defendant next argues that he was deprived of a fair trial when Samuel falsely testified that his son's dying words were "that damn Ricardo shot me." The defendant contends that, because the evidence against him was so threadbare, Samuel's false testimony necessarily had a devastating impact on the fairness of his trial. The defendant insists that the trial court therefore erred in not granting a mistrial *sua sponte*.

¶ 46    Prior to trial, the trial court ruled that Robinson's statement to Samuel, "that damn Richard shot me," would be admissible as a dying declaration. At trial, on direct examination, Samuel testified that Robinson's statement was "that damn Ricardo shot me." Samuel then testified to how his son was taken to a hospital and how he subsequently learned that his son had died. At this point, defense counsel objected, arguing that Samuel's testimony, using the defendant's name, "Ricardo," was substantially different from the statement using the name "Richard," which the trial court had allowed as a dying declaration. The trial court responded that defense counsel could cross-examine Samuel as to the exact name that Robinson had used. After the trial court's ruling, the State asked for "the record [to] reflect that [Samuel] is clearly distraught on the witness stand, weeping, audibly sobbing." On cross-examination, Samuel acknowledged that the name his son had actually used was "Richard."

¶ 47    Even where defense counsel does not request a mistrial, the trial court has the discretion to grant one. *People v. Monroe*, 366 Ill. App. 3d 1080, 1094 (2006); see also *People v. Williams*, 201 Ill. App. 3d 207, 221 (1990) (the trial court has the responsibility to see that the proceedings are conducted in an orderly manner with proper decorum, and the control of the conduct of the trial rests within its discretion). However, we do not believe that the trial court here abused its discretion in not granting a mistrial. See *People v. Sambo*, 197 Ill. App. 3d 574, 584 (1990) (determining that whether to order a mistrial is within the trial court's discretion). Although the defendant complains about Samuel's "highly emotional" testimony that Robinson identified the defendant ("Ricardo") as the person who shot him, the record is not clear as to whether Samuel was "clearly distraught" when discussing his son's dying declaration or when discussing how he learned of his son's death. In any event, the trial court was in a better position to assess whether Samuel's "highly emotional" testimony had an improper effect on the jury. See *People v. Beltran*, 2011 IL App (2d) 090856, ¶ 68 (trial court was in better position to assess whether prosecutor's use of an "emotional voice" improperly inflamed the passions of the jury or prejudiced the defendant); see also *People v. Davis*, 378 Ill. App. 3d 1, 13 (2007) (trial court is in far superior position than reviewing court to assess witness's tone of voice). Based on this record, we believe that the trial court's handling of this issue–allowing defense counsel to bring out on cross-examination that in fact Robinson had identified "Richard," not "Ricardo," as his shooter–did not deprive the defendant of a fair trial.

¶ 48    The defendant's next contention on appeal is that the trial court abused its discretion when it allowed evidence of his past gang activity. The defendant argues that, since he had already conceded his gang affiliation, such evidence constituted improper character evidence, which deprived him of a fair trial.

¶ 49    In response, the State argues that this issue is forfeited because the defendant did not raise it at trial or in his posttrial motion. However, a review of the record indicates that the defendant preserved this issue by raising it both at trial and in his posttrial motion. Thus, we will consider the merits of his contention.

¶ 50   The State presented four witnesses to establish that the defendant was in the Latin Kings street gang. Gary Anderson testified that on June 4, 2010, the defendant approached him and informed him that he was a Latin King and that "he needed to stay away from other gangs."

¶ 51   Westley Kemp of the Winnebago County sheriff's department testified that he was assigned to Harlem High School as a school resource officer. On January 22, 2008, he learned that graffiti had been discovered in one of the bathrooms. The defendant acknowledged that he had drawn the markings.

¶ 52   John Anderson testified that he worked at a juvenile detention center. On October 15, 2006, he conducted a booking interview with the defendant. The defendant indicated that he was a member of the Latin Kings.

¶ 53   Posley testified that he had specialized training in street gangs. He was familiar with gang symbols, handshakes, hand gestures, codes, territories, and other indicia. He described the symbols and hand gestures of the Latin Kings and the Insane Unknowns. He described those two gangs as rivals. Posley reviewed a picture that the defendant had drawn in the Harlem High School bathroom on January 22, 2008, and he testified that the markings were Latin Kings graffiti. Based on the defendant's drawing the graffiti as well as telling John Anderson and Gary Anderson of his gang affiliation, Posley believed that the defendant was a member of the Latin Kings.

¶ 54   Although jurors might have negative feelings about street gangs, it is not necessary to exclude gang-affiliation evidence if it is otherwise relevant and admissible. *People v. Blue*, 205 Ill. 2d 1, 15 (2001). Evidence that relates to the defendant's gang membership or activities may be admitted at trial, despite its prejudicial effect, to establish a common purpose or design or to provide a motive for an otherwise inexplicable act. *People v. Patterson*, 154 Ill. 2d 414, 458 (1992); *People v. Knox*, 241 Ill. App. 3d 205, 211 (1993). Relevant gang-related evidence is not excluded simply because it is prejudicial; rather, it is admissible as long as it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003); *Knox*, 241 Ill. App. 3d at 211. A trial court's decision regarding the admission of gang-related evidence will not be disturbed absent an abuse of discretion. *People v. Villarreal*, 198 Ill. 2d 209, 232 (2001).

¶ 55   We do not believe that the trial court abused its discretion in admitting the gang-related evidence. The State's theory of why the defendant and Robinson were involved in an altercation was that they were in rival gangs. Gary Anderson's and John Anderson's testimony was therefore relevant, as both testified that the defendant had identified himself to them as a Latin King. Posley's testimony was relevant, as it established that, not only did the defendant claim to be a Latin King, he acted like a Latin King when he drew Latin Kings graffiti at school. Posley's testimony that the Latin Kings and the Insane Unknowns were rival gangs was also clearly relevant. See *People v. Hamilton*, 328 Ill. App. 3d 195, 202 (2002) (evidence of gang membership and rivalries is relevant when it establishes reasons for deadly gang behavior).

¶ 56   In so ruling, we reject the defendant's argument that the presentation of any gang-related evidence was unnecessary, and therefore unduly prejudicial, because defense counsel conceded in opening statements that the defendant was in a gang. Opening statements are not evidence. Defense counsel's concession did not preclude the State from presenting evidence to support its theory of the case. See *People v. Mason*, 274 Ill. App. 3d 715, 723 (1995) (State had

the right to present evidence that the defendant was a gang member, in order to demonstrate motive).

¶ 57 We also find that the defendant overstates how "excessive" the State's gang-related evidence was. Gary Anderson and John Anderson testified to little more than that the defendant had identified himself as a Latin King. Kemp testified that the defendant had acknowledged drawing graffiti in the school bathroom. Posley's testimony, although more extensive, pertained only to the issues in the case (significance of gang hand gestures and symbols, rivalries between gangs). We do not believe that the trial court abused its discretion in allowing such evidence to establish the defendant's gang affiliation. *Cf. id.* at 720-22 (gang-related evidence found to be excessive where State presented evidence that had no bearing on case, such as elements of gang life and details on various Chicago gangs and their affiliations with two large national organizations).

¶ 58 The defendant further asserts that evidence that he had been at a juvenile detention center was improper in light of our supreme court's decisions in *People v. Villa*, 2011 IL 110777, ¶ 41, and *People v. Montgomery*, 47 Ill. 2d 510 (1971). In those cases, our supreme court held that juvenile adjudications are not admissible against a defendant unless they are used to impeach a testifying defendant who has misled the jury about his criminal history or opened the door by testifying about his prior adjudications. *Villa*, 2011 IL 110777, ¶¶ 46, 49; *Montgomery*, 47 Ill. 2d at 516. The defendant acknowledges that the State did not actually introduce any evidence of a juvenile adjudication. However, he complains that evidence of his interaction with a juvenile detention officer was just as bad because "[c]ommon sense dictates that one is not subject to detention as a juvenile without some process and adjudication for wrongdoing."

¶ 59 We find the defendant's argument unpersuasive. As noted above, the State had the right to present evidence that the defendant was in a gang. See *Mason*, 274 Ill. App. 3d at 723. In presenting that evidence, the State also had the obligation to provide a proper foundation for it. See *People v. Nieves*, 193 Ill. 2d 513, 537-38 (2000) (testimony that lacks a proper foundation as to the witness's personal knowledge of events amounts to no evidence at all). Thus, it was not improper for the State to solicit John Anderson's testimony that he was working at a juvenile detention facility when he learned from the defendant that the defendant was a Latin King. Moreover, the testimony was minimal, as Anderson did not testify to why the defendant was at the juvenile detention facility. *Cf. People v. Markiewicz*, 246 Ill. App. 3d 31, 40 (1993) (trial court does not err where it carefully limits evidence of other crimes to that which is relevant to the issues on which the other-crimes evidence is admitted). As neither *Knox* nor *Montgomery* barred the evidence at issue, and as the evidence was limited to the defendant's identifying himself as a Latin King, we cannot say that the trial court abused its discretion in admitting that evidence. See *Villarreal*, 198 Ill. 2d at 232.

¶ 60 That being said, we do not believe that it was necessary for the State to introduce John Anderson's testimony, because it was duplicative of Gary Anderson's testimony, *i.e*, the defendant identified himself as a Latin King. Just because a prosecutor can introduce certain evidence does not mean that he or she should. The prosecutor's interest in a criminal prosecution " 'is not that it shall win a case, but that justice shall be done.' " *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Although we have determined that the gang-related evidence described above was not excessive to the point of being unduly prejudicial, we believe that the evidence was close to

crossing that forbidden threshold. We therefore urge the State to be more circumspect in its use of such cumulative evidence in similar cases in the future.

¶ 61    The defendant's final contention on appeal is that he was deprived of the effective assistance of counsel. Specifically, he argues that defense counsel was ineffective for (1) eliciting evidence in support of the State's case and (2) proceeding with a strategy that, if taken to its logical conclusion, supported the State's theory of the defendant's guilt.

¶ 62    In his opening statement, defense counsel asserted that the jury might be presented with credible evidence that (1) Isaac was at the scene of the crime; (2) Isaac had a motive to be there; and (3) the defendant's vehicle was there. However, defense counsel insisted that there would be no credible evidence that the defendant was there or that he had any motive to help Isaac.

¶ 63    In questioning Samuel, defense counsel elicited testimony that Robinson had been in a fight with "Richard" at East High School and that "Richard" was a Latin King. Defense counsel elicited from Lithsrup that, at school on May 14, 2010, Isaac complained to her that someone had broken windows on his Chevy Suburban.

¶ 64    In closing arguments, defense counsel argued that "Richard really is Isaac." He noted that Isaac and Robinson went to the same high school. Defense counsel argued that Isaac had a motive to shoot Robinson, because he "was getting revenge for his car windows getting broken out." Defense counsel then pointed to both Robinson's dying declaration and Dangel's testimony that Isaac was in fact the one who had shot Robinson. Defense counsel further argued that the defendant's vehicle's presence at the scene did not mean that the defendant was there. Defense counsel further insisted that the defendant had no motive to shoot Robinson and that there was no proof that he had helped Isaac.

¶ 65    In reviewing a claim of ineffective assistance of counsel, the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), apply. *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To succeed on such a claim, a defendant must show both that his counsel's performance "fell below an objective standard of reasonableness" (*Strickland*, 466 U.S. at 688) and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694). A defendant is entitled to competent representation, not perfect representation. *People v. West*, 187 Ill. 2d 418, 432 (1999). Errors in strategy do not constitute ineffective assistance of counsel. *People v. Gonzalez*, 407 Ill. App. 3d 1026, 1038 (2011). Only when a strategic decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness will the strategy constitute ineffective assistance of counsel. *People v. Manning*, 241 Ill. 2d 319, 343 (2011).

¶ 66    Here, we do not believe that defense counsel's strategy rose to the level of ineffective assistance of counsel. Defense counsel was confronted with some difficult evidence: two witnesses placed Isaac at the scene of the crime and four witnesses placed the defendant's vehicle there. Rather than argue that all of those witnesses were mistaken, and thereby possibly undermine his own credibility, defense counsel chose to concede that evidence and instead argue that there was no credible evidence that placed the defendant himself at the scene of the crime. As Patrick was the State's only witness who placed the defendant at the crime scene–and as he gave multiple conflicting accounts about what happened on the day in question–defense counsel's strategy that focused on attacking Patrick's credibility was not unreasonable.

¶ 67 In so ruling, we reject the defendant's argument that defense counsel was ineffective for eliciting evidence that Isaac had an independent motive to kill Robinson, *i.e.*, revenge. Although defense counsel, not the State, presented evidence that provided a motive for Isaac's actions, the record indicates that this was part of defense counsel's strategy to point all of the blame away from the defendant and toward Isaac. This evidence did not help the State prove part of its case that it otherwise failed to prove. *Cf. People v. Jackson*, 318 Ill. App. 3d 321, 327-28 (2000) (defense counsel was ineffective where his strategy established an element of the offense that had not been established in the State's case).

¶ 68                                   CONCLUSION

¶ 69 For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

¶ 70 Affirmed.