# Illinois Official Reports

## Appellate Court

---

### *People v. Murray*, 2017 IL App (2d) 150599

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEONTAE X. MURRAY, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0599 |
| Filed<br>Modified upon<br>denial of rehearing | December 13, 2017<br><br>January 31, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Boone County, No. 13-CF-86; the Hon. C. Robert Tobin III, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Michelle J. Courier, State's Attorney, of Belvidere (Patrick Delfino, Lawrence M. Bauer, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices Jorgensen and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Deontae X. Murray, appeals his convictions of first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)) and unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)) following a jury trial in the circuit court of Boone County. We affirm as modified.

¶ 2                              I. BACKGROUND

¶ 3    On July 19, 2013, a Boone County grand jury returned a three-count amended indictment charging defendant with first degree murder in connection with the April 21, 2013, shooting death of Richard J. Herman in Belvidere, Illinois (count I), aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(A), (d) (West 2012)) (count II), and unlawful possession of a firearm by a street gang member (count III). The jury convicted defendant of all three offenses. The jury also found that defendant was armed with a firearm during the commission of the offenses. The court merged count II into count III and sentenced defendant to an aggregate of 60 years' incarceration in the Illinois Department of Corrections. The following evidence relevant to the issues in this appeal was adduced at trial. We will augment our discussion of the evidence where necessary in the analysis portion of the opinion.

¶ 4                        A. Defendant's Gang Affiliation

¶ 5    The State introduced defendant's gang affiliation to show the motive for Herman's murder. The State argued that defendant facilitated the shooting when he handed the murder weapon to Marco "Wacko" Hernandez, who shot Herman.[1]

¶ 6    Officer David Dammon of the Belvidere police department testified for the State as an expert on gang activity. He testified that defendant was a member of the Latin Kings street gang. He based his opinion on his personal experience with defendant, information in the police department's gang database, defendant's association with other known Latin Kings, defendant's use of gang signs, and defendant's mode of dress. According to Dammon, Hernandez was also a member of the Latin Kings but was so low in the hierarchy that he would not be permitted by the gang to carry a gun. Dammon detailed the criminal nature of street gangs in general and the Latin Kings in particular. Dammon further testified, without objection, that the Latin Kings are an organized street gang as defined by statute. See 740 ILCS 147/10 (West 2012).

¶ 7                        B. The Shooting of Richard Herman

¶ 8    On April 21, 2013, defendant attended a birthday party at the home of Mallek Sanchez in Belvidere. Sanchez was a "higher-up" in the Latin Kings. Hernandez was also at the party. Defendant and Hernandez left the party and walked to a nearby Shell gas station to buy beer and a cigar. Max Cox, who was a member of the rival gang the Surenos 13, and Herman, Cox's

---

[1]Hernandez was tried separately. This court reversed his conviction and remanded for a new trial because the State improperly introduced a hearsay statement as substantive evidence and the court improperly instructed the jury that it could consider the statement as substantive evidence. *People v. Hernandez*, 2017 IL App (2d) 141104-U, ¶¶ 14, 23.

companion, were at the Shell station. Cox was prepaying for gas, and Herman was at the coolers buying beer. Cox and defendant knew each other as Cox had previously sold cannabis to defendant. Hernandez had a recent confrontation with Cox.

¶ 9                                   1. Cox's Testimony

¶ 10        At approximately 6:30 p.m. on April 21, 2013, Cox parked his car next to pump No. 5 at the Shell station, and he and Herman went inside the store. Defendant and Hernandez were in the store. Herman waved Cox to his location by the coolers and told Cox something about Hernandez. Then Cox prepaid for gas, Herman paid for a case of beer, and they left the store. Herman placed the beer in the back passenger seat of Cox's car, taking out a can for himself. Cox was on the driver's side of the car, pumping gas, when he saw defendant and Hernandez walking toward him. Defendant stopped at his front bumper, and Hernandez stopped 10 or 15 feet from the front bumper. Hernandez was yelling.

¶ 11        Defendant asked Cox if he was "gang banging," meaning was Cox "hanging out" with the Surenos 13. Cox said no. Defendant accused Cox of lying. Then defendant lifted his shirt and exposed a gun on his left side. Cox described the gun as "black, square, decent size." Defendant then covered the gun with his shirt again. Hernandez stepped in front of defendant, stepped away, and put a "pistol" behind his back. Then Hernandez began arguing with Herman. Cox told Herman to shut up, that Hernandez had a gun. Then Hernandez pulled out the pistol, ran up to Herman, and shot him.

¶ 12        On cross-examination, Cox testified that defendant was at least 10 feet away from him during the incident. Cox testified that he did not see the exchange of the gun from defendant to Hernandez. Cox agreed that he did not know whether defendant handed the gun to Hernandez or whether Hernandez grabbed it. According to Cox, the entire incident took approximately a minute and a half.

¶ 13                                2. Dan Arevalo's Testimony

¶ 14        Dan Arevalo was the cashier at the Shell station on the evening of April 21, 2013. He looked out the window and saw Cox pumping gas. He also saw Herman and defendant arguing. He did not see Hernandez. Arevalo attended to some customers, and when he looked outside again a few seconds later, he saw Hernandez at the passenger side of Cox's car. Arevalo testified that Hernandez was running toward Herman, reaching for a gun from behind his back. He saw Hernandez point the gun at Herman, at which time Arevalo "backed away." Arevalo heard a shot. He immediately called 911. When Arevalo next looked outside, he saw defendant and Hernandez running away.

¶ 15                                3. Gerald Keeney's Testimony

¶ 16        On the evening of April 21, 2013, Keeney stopped at the Shell station to buy lottery tickets. He sat in his pickup, scratching his tickets on the center console, when he heard people arguing. He saw two white men (presumably Cox and Herman) at a gas pump. The next thing Keeney heard was a gunshot. He ducked down. When he looked out again, he saw a black man waving a gun. Keeney ducked down again. The next time he looked out, he saw the black man and a Hispanic man running toward the back of the station.

¶ 17                               C. The Crime Scene and Investigation

¶ 18    A woman flagged down police officer Jeremy Bell and told him that she saw two people running through an alley. Bell searched the area, but he did not locate anyone. Sergeant Shane Woody responded to the scene and saw Herman lying face-up on the pavement near pump No. 5. He noted a bullet hole in Herman's chest. Herman was transported to a Rockford hospital, where he died at approximately 7 p.m.

¶ 19    Illinois State Police investigator Rebecca Hooks processed the scene for evidence. Arevalo turned over a Shell station surveillance video to Dammon. Dammon recognized defendant on the video, but he did not recognize Hernandez. Cox and Arevalo each identified defendant from a photo lineup, and they later identified Hernandez as the shooter from a second photo lineup.

¶ 20    Dr. Larry Blum, a forensic pathologist, performed an autopsy on Herman. Dr. Blum testified that the bullet caused Herman's left lung to collapse and then exited his back. Herman died of hemorrhagic shock due to a gunshot wound to the chest.

¶ 21    After the murder, defendant moved among various addresses in Harvard, Rockford, and Freeport, and he was considered by the police to be a fugitive. Defendant's wandering was aided by another Latin King, Anthony Perez. In late April 2013, the Belvidere police enlisted the help of the United States Marshals to apprehend defendant. On May 9, 2013, the police and the marshals executed a search warrant at Perez's mother's apartment in Winnebago County. The police recovered a state-issued ID card for defendant, mail belonging to Perez, drug paraphernalia, cannabis, two firearms, and ammunition.

¶ 22    On the top shelf of the bedroom closet, the police found a Glock gun case. Inside the gun case were a black Glock Model 30 pistol, two magazines, and a magazine motor. Later, a forensic test determined that the Glock was used to kill Herman. Perez's fingerprints were found on the gun's slide, but there was no DNA on the gun that was suitable for analysis.

¶ 23    On May 10, 2013, police officers searched a residence at 925 11th Street in Rockford. They observed a woman trying to get into the house. She was placed in custody and identified as Heather Swanson, defendant's girlfriend. While placing Swanson in custody, the officers heard a "crash" in some bushes north of the property. The officers jumped over a chain link fence and arrested defendant, who was lying in the bushes. Defendant stated, "Yeah, I know I'm wanted. I was going to turn myself in."

¶ 24    The police seized defendant's cell phone. Two videos recorded approximately two hours before the shooting showed (1) Perez urinating on a building in Belvidere that bore Surenos 13 gang graffiti and (2) defendant "throwing up" a Latin Kings sign while Perez "threw down" a Surenos 13 sign and said "13 killer."


¶ 25                                   D. Additional Trial Testimony
¶ 26                                        1. Swanson's Testimony

¶ 27    The State called Swanson in its case-in-chief. Swanson testified that she was in jail on the evening of the murder. She spoke on the phone with defendant that night, and she later saw him in early May 2013.

¶ 28    The prosecutor asked Swanson what defendant told her about what happened at the Shell station. Swanson testified: "There was an argument and *** his friend shot somebody." Swanson testified that she knew that Cox was also at the Shell station. The prosecutor then

asked her the following question: "So what, if anything, did [defendant] tell you about what [Cox] was doing at the Shell station?" Swanson replied that she did not know "specifically." The prosecutor then asked what defendant told her about "the gun." She answered: "He didn't tell me anything." The prosecutor asked the same question again, and Swanson testified: "[Defendant told me that] [Hernandez] shot the guy that was at the gas station." The prosecutor then asked: "What, if anything, did [defendant] tell you about where that gun came from—about where he got it from?" Swanson testified: "He didn't."

¶ 29 The prosecutor then asked if Swanson recalled telling the police that defendant "said he pulled the gun out of his belt and gave it to [Hernandez]." She admitted that she told that to the police. The prosecutor next asked Swanson whether she told the police that defendant said that Hernandez shot Herman after defendant gave Hernandez the gun. Swanson said, "I think so, yes."

¶ 30 Swanson testified that defendant told her that he was with Hernandez after the shooting. Defendant also told her that Perez was arrested with a "bunch of guns," so she assumed that Perez had the murder weapon. Swanson then agreed that she told the police that defendant told her that the gun was at Perez's apartment.

¶ 31 On cross-examination, Swanson testified that she had felt "threatened" by the police when they questioned her after she and defendant were arrested. She testified that she specifically was "scared" of Dammon and that this caused her to tell the police untruths.

¶ 32                            2. Richard Hobson's Testimony

¶ 33 Richard Hobson testified as an expert on armed gunmen's characteristics. A former Washington, D.C., police officer, he was professionally trained, and taught courses, on the detection and recovery of firearms. Hobson viewed the surveillance video from the Shell station from the evening of the murder. He had been informed that the gun in question was a Glock Model 30 .45-caliber semiautomatic pistol. Based upon certain characteristics that defendant displayed inside the store that evening, Hobson opined that defendant was carrying a firearm concealed on his left side.

¶ 34                              3. Defendant's Testimony

¶ 35 Following the court's denial of his motion for a directed verdict, defendant testified on his own behalf. Prior to trial, the court had ruled that the State could use defendant's prior conviction of felony obstruction of justice to impeach him if he testified. The court barred the State from using defendant's prior conviction of aggravated battery for impeachment purposes, ruling that it was too prejudicial. Nonetheless, under defense counsel's questioning, defendant testified that he had previously been convicted of obstruction of justice, aggravated battery, and attempted obstruction of justice, a misdemeanor. Defendant testified that he was no longer a member of the Latin Kings. He also testified that members of the Belvidere Latin Kings did not carry firearms.

¶ 36 Defendant testified that Hernandez pointed at Cox's car at the Shell station. Defendant knew that Hernandez and Cox had a recent confrontation. Then, Hernandez showed defendant a pistol. Defendant took the pistol, thinking that he did not want "anything bad" to happen to Cox and that, because there were probably cameras "everywhere," it would be "stupid" to

display a gun. Defendant put the gun in his pocket, and he told Hernandez that he would "handle it."

¶ 37 Defendant testified that Cox and Herman came out of the store. Defendant walked toward Cox and "confronted him." Defendant asked Cox if he was "gang banging to try to chase [Hernandez]." Cox said "no." At that time, Hernandez and Herman were arguing and yelling. Thirty seconds into defendant's conversation with Cox, he felt the gun being "yanked" from his pocket. Then defendant saw Hernandez put the gun behind his back. Hernandez ran toward Herman and shot him. Defendant panicked and fled the scene. He did not go to the police because he was afraid of reprisals from the Latin Kings.

¶ 38 After defendant testified, he rested.

### 4. The State's Rebuttal and Closing Argument

¶ 40 In rebuttal, Maria Ledesma testified that she bought a Glock Model 30 .45-caliber pistol in Belvidere in 2012, while she was dating Perez. She did not know Hernandez. The State also introduced photos depicting defendant with various firearms, including a Glock pistol.

¶ 41 In his rebuttal closing argument, the prosecutor argued that Swanson told the truth when she admitted that she told the police that defendant told her that he gave the gun to Hernandez.

### E. Sentencing

¶ 43 The trial court denied defendant's posttrial motion and proceeded to sentencing. Herman's mother read a victim impact statement, and the prosecutor read statements from Herman's children. In allocution, defendant remarked only that there were no African-Americans on the jury. The court found that defendant displayed "no remorse over what [is] an otherwise senseless act." The court sentenced defendant to 50 years' incarceration for first degree murder, merged the weapons charges, and sentenced defendant to 10 years' incarceration for unlawful possession of a firearm by a gang member. The court denied defendant's motion to reconsider the sentence, and he filed a timely appeal.

### II. ANALYSIS

¶ 45 Defendant raises the following eight issues.

### A. Reasonable Doubt of Murder

¶ 47 Defendant first argues that the State did not prove that he was accountable for Herman's murder. In assessing whether the evidence was sufficient to prove a defendant's guilt beyond a reasonable doubt, the reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Taylor*, 186 Ill. 2d 439, 445 (1999). A conviction should not be reversed unless the proof is so improbable or unsatisfactory that a reasonable doubt exists about the defendant's guilt. *Taylor*, 186 Ill. 2d at 445. A defendant commits first degree murder when, in performing the acts that cause the death of an individual, he knows that such acts create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(2) (West 2012). A defendant is legally accountable for the actions of another when, either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he or she "solicits, aids, abets, agrees, or

attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012); see *Taylor*, 186 Ill. 2d at 445. To prove intent to promote or facilitate the commission of an offense, the State must establish that the defendant shared the criminal intent of the principal or that there was a common criminal design. *People v. Jaimes*, 2014 IL App (2d) 121368, ¶ 37.

¶ 48 Defendant argues that the only "first-hand" accounts of the shooting were given by Cox and himself. Defendant asserts that their "largely consistent" versions do not establish that he gave Hernandez the gun knowing that Hernandez was going to kill Herman. Defendant also maintains that the accounts do not establish that he and Hernandez shared a common design to kill Herman. By focusing solely on his and Cox's accounts, while ignoring the totality of the State's evidence, defendant distorts the picture.

¶ 49 Defendant and Hernandez, who were Latin Kings, were rivals of Cox, who belonged to the Surenos 13. Approximately two hours before the shooting, defendant and Perez, another Latin King, were recorded displaying gang signs and doing other acts that were disrespectful of the Surenos 13. On the video, Perez intoned "13 killer." Inside the Shell station's store, Hernandez called defendant's attention to Cox's presence. Defendant knew that Hernandez and Cox had a recent confrontation. In Hobson's expert opinion, defendant was armed.

¶ 50 Outside the store, both defendant and Hernandez initiated a gang fight with Cox and Herman. After defendant and Hernandez left the store, defendant approached Cox and demanded to know if Cox was "gang banging." Defendant lifted up his shirt to display a gun. Hernandez and Herman were arguing. Earlier, Arevalo witnessed defendant arguing with Herman. Hernandez obtained the gun from defendant, without a struggle or a word, and shot Herman. Keeney immediately saw a black man waving the gun. The only black man at the scene was defendant. Defendant and Hernandez fled together, and the police recovered the murder weapon from Perez's apartment, where they also discovered defendant's photo ID. Supporting the State's theory that defendant, rather than Hernandez, brought the gun to the scene was Ledesma's rebuttal testimony that she bought a Glock Model 30 .45-caliber handgun while she was dating Perez. Defendant hid out in a series of locations until the police arrested him lying in some bushes.

¶ 51 Mere presence at the scene of a crime does not itself make a person accountable, but it is a factor that can be considered, together with other circumstances, to determine accountability. *Jaimes*, 2014 IL App (2d) 121368, ¶ 38. Active participation in the offense is not a requirement for a finding of guilt under an accountability theory. *Jaimes*, 2014 IL App (2d) 121368, ¶ 38. The trier of fact may consider factors such as the maintenance of a close affiliation with the companion after the commission of the crime, flight from the scene, and the failure to report the crime. *Jaimes*, 2014 IL App (2d) 121368, ¶ 38. We determine that the jury, viewing the evidence in the light most favorable to the prosecution, could conclude beyond a reasonable doubt that defendant was guilty of Herman's murder by accountability.

¶ 52 B. Introduction of Swanson's Prior Inconsistent Statement

¶ 53 Defendant contends that Swanson's statement to the police—that defendant told her that he pulled the gun out of his belt and gave it to Hernandez—was not admissible either as substantive evidence or for impeachment. Defendant acknowledges that he did not preserve the issue for review, but he argues that it is plain error. Alternatively, defendant contends that his trial counsel rendered ineffective assistance when he failed to object to the introduction of

the statement. The State concedes that error occurred, but it contends that it did not rise to the level of plain error. The State also argues that counsel's performance did not result in prejudice.

¶ 54                                    1. Substantive Evidence

¶ 55        Generally, hearsay—an out-of-court statement offered for the truth of the matter asserted—is inadmissible at trial. *People v. McCarter*, 385 Ill. App. 3d 919, 929-30 (2008). Section 115-10.1(c)(2) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1(c)(2) (West 2012)) provides a hearsay exception for a prior inconsistent statement of a testifying witness. Under section 115-10.1(c)(2), a witness's prior inconsistent statement may be admitted as substantive evidence if it "narrates, describes, or explains an event or condition of which the witness had personal knowledge." 725 ILCS 5/115-10.1(c)(2) (West 2012). "Personal knowledge" requires that the witness actually saw the events that are the subject of the statement. *McCarter*, 385 Ill. App. 3d at 930. Here, it is undisputed that Swanson was in jail when the shooting occurred and could not have witnessed the event. See *People v. Simpson*, 2015 IL 116512, ¶ 31 ("event" is not defendant's admission but the offense described in the admission). Accordingly, her prior inconsistent statement was not admissible as substantive evidence under section 115-10.1(c)(2).

¶ 56                                      2. Impeachment

¶ 57        Section 115-10.1 provides that a prior inconsistent statement that does not meet the criteria for admission as substantive evidence may, nevertheless, be used as impeachment. To be used as impeachment, a prior inconsistent statement must be truly inconsistent with the witness's trial testimony, and it must deal with a matter that is more than collateral. *People v. Thomas*, 354 Ill. App. 3d 868, 877 (2004). Illinois Supreme Court Rule 238(a) (eff. Apr. 11, 2001) allows a party to impeach its own witness with a prior inconsistent statement when the witness's testimony affirmatively damages that party's case. *People v. French*, 2017 IL App (1st) 141815, ¶ 42. A witness's testimony is affirmatively damaging, rather than merely disappointing, when it gives positive aid to the other side. *French*, 2017 IL App (1st) 141815, ¶ 42. The witness's testimony must be more damaging than his complete failure to testify would have been before impeachment is permitted. *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982).

¶ 58        Defendant argues that Swanson's testimony that defendant did not tell her anything about how Hernandez got the gun did not affirmatively damage the State's case because it did not exculpate defendant. Defendant maintains that Swanson's testimony merely disappointed the State because it failed to incriminate defendant. The State agrees. Although the reviewing court is not bound by a party's concession (*In re Brandon P.*, 2014 IL 116653, ¶ 44), we accept the State's concession because the prosecution was no worse off than if Swanson had not testified. The State still had strong evidence that defendant intended to promote or facilitate Herman's murder.

¶ 59        However, we reject defendant's plain-error argument. The plain-error doctrine allows the reviewing court to consider unpreserved error when (1) a clear or obvious error occurred, and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the accused, regardless of the seriousness of the error, or (2) a clear or obvious error occurred that was so serious that it affected the fairness of the trial and challenged the integrity

of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). For purposes of the plain-error doctrine, we have already determined that the State's introduction of Swanson's prior inconsistent statement was clear or obvious error. Next, under the first prong of the plain-error analysis, defendant must demonstrate that the error was prejudicial by showing that the quantum of evidence presented by the State rendered the evidence closely balanced. See *Piatkowski*, 225 Ill. 2d at 566. Whether the evidence is closely balanced is a question separate from whether the evidence is sufficient to sustain a conviction against a reasonable-doubt challenge. *Piatkowski*, 225 Ill. 2d at 566.

¶ 60    As noted above, to prove that a defendant intended to promote or facilitate the crime, the State must present evidence that (1) the defendant shared the principal's criminal intent or (2) there was a common criminal design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Under the common-criminal-design rule, if two or more persons engage in a common criminal design or agreement, any acts committed by one party in the furtherance of that design or agreement are considered the acts of all parties to the design or agreement, and all parties are equally responsible for the consequences of further acts. *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 61    Here, the State, without expressly so articulating, proceeded under the common-criminal-design rule. In essence, the State theorized that, when Hernandez shot Herman, defendant was equally responsible because the shooting was done in furtherance of the common criminal design to inflict violence. In closing argument, the prosecutor argued the common-criminal-design rule when he highlighted that defendant was "looking to start a gang fight on the day of the murder." The prosecutor stated that defendant went to the Shell station armed with the Glock because he intended "unlawfully to use it." The prosecutor emphasized that defendant was "hanging out" with other members of the Latin Kings that day and that he filmed Perez saying "13 killers." The prosecutor argued that when defendant and Hernandez encountered Cox, a member of the Surenos 13, at the Shell station, defendant "promoted" the gang fight that led to Herman's murder. The prosecutor reminded the jury that Arevalo saw defendant and Herman arguing and that defendant accused Cox of gang banging before he displayed the gun to Cox.

¶ 62    Under this theory, which was overwhelmingly substantiated by the totality of the evidence,[2] it would not matter whether Hernandez grabbed the gun from defendant or defendant gave him the gun. When Hernandez saw Cox's car parked at pump No. 5, he pointed it out to defendant. Defendant knew that Cox and Hernandez had a recent gang-related encounter. Inside the Shell station's store, Herman told Cox "something" about Hernandez. Defendant testified that Hernandez looked a certain way at Herman and Cox while they were all inside the store. Then, outside, defendant engaged Herman and then Cox in a verbal gang quarrel, displaying his gun to Cox, while Hernandez joined by arguing with Herman. At that point, Hernandez and defendant were jointly engaged in provoking gang violence. Defendant displayed his gun to Cox, sending the message that he was prepared to use it. Cox understood this, because after Hernandez got the gun, Cox told Herman to shut up. Hernandez stepped next to defendant, and the gun passed between them without a fight or a protest from defendant. Then Hernandez shot Herman.

_____

[2]In defendant's petition for rehearing, he focuses solely on Cox's and his own testimony in arguing that the evidence was closely balanced. Defendant ignores the substantial evidence that inculpated him under the common-criminal-design rule.

¶ 63    Where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids, and the word "conduct" encompasses any criminal act done in furtherance of the planned and intended act. *People v. Kessler*, 57 Ill. 2d 493, 497 (1974). The evidence shows that defendant was legally accountable for Hernandez's act, even if defendant did not hand Hernandez the gun. Accordingly, the introduction of Swanson's prior inconsistent statement did not prejudice defendant.

¶ 64    Defendant additionally contends that, under the second prong of the plain-error analysis, the introduction of Swanson's prior inconsistent statement requires reversal of his conviction. If a defendant carries the burden of showing that the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process, prejudice is presumed. *People v. Sebby*, 2017 IL 119445, ¶ 50. We determine that defendant has not demonstrated second-prong plain error. As discussed above, proof of defendant's culpability under the common-criminal-design rule does not rest on whether defendant handed Hernandez the gun. Consequently, the introduction of Swanson's prior inconsistent statement did not affect the fairness of the trial.

¶ 65    We also reject defendant's claim of ineffective assistance of counsel. Claims of ineffective assistance of counsel are resolved according to the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland*, 466 U.S. at 687. To establish deficient performance, the defendant must show that his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219 (2004). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Evans*, 209 Ill. 2d at 219-20. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome, in that counsel's deficient performance rendered the trial result unreliable or the proceeding unfair. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 23. The failure to satisfy either *Strickland* prong precludes a finding of ineffective assistance of counsel. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24. Where, as here, the claim of ineffective assistance of counsel was not raised in the trial court, our review is *de novo*. *Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 66    Having determined that Swanson's prior inconsistent statement was inadmissible for any purpose, we also determine that counsel's failure to object to its admission fell below an objective standard of reasonableness. However, defendant cannot demonstrate prejudice for the reasons stated above.

¶ 67            C. Ineffective Assistance of Counsel—Introduction of Prior Convictions

¶ 68    The State moved *in limine* to introduce defendant's felony convictions for impeachment purposes if he testified. Defendant was convicted of felony obstruction of justice in 2011 and aggravated battery in 2012. The court allowed the State to use the obstruction-of-justice conviction, ruling that it was less prejudicial than the aggravated-battery conviction. The court also prevented the State from naming the felony (aggravated battery) that was the predicate for the charge of aggravated unlawful use of a weapon

¶ 69    However, during defendant's testimony, defense counsel deliberately introduced both felony convictions plus a misdemeanor conviction for attempted obstruction of justice. Defendant argues that counsel's performance was deficient, depriving him of a fair trial. The

State asserts that counsel's trial strategy was to make defendant look as candid as possible in light of his damaging admissions that he possessed the murder weapon and was a gang member. The State also posits that eliciting the aggravated-battery conviction relieved the jury of speculating about the nature of the felony that underlay the charge of aggravated unlawful use of a weapon.

¶ 70　　There is a strong presumption that trial counsel's conduct was reasonable and that the challenged action or inaction was the product of trial strategy. *Lofton*, 2015 IL App (2d) 130135, ¶ 24. Decisions concerning which witnesses to call and what evidence to present on a defendant's behalf rest with trial counsel and are matters of trial strategy. *People v. Williams*, 317 Ill. App. 3d 945, 950 (2000). Trial strategy includes the decision whether to use a defendant's prior convictions to suggest to the jury that the defendant is testifying honestly, because he is not concealing his prior convictions. *Williams*, 317 Ill. App. 3d at 950. This issue is raised for the first time on appeal, so our review is *de novo*. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 71　　Defendant relies on *People v. Fletcher*, 335 Ill. App. 3d 447 (2002). In *Fletcher*, defense counsel had the defendant recite all of his extensive prior criminal history, including inadmissible juvenile arrests from the age of 14, and then allowed the prosecutor on cross-examination to delve into the details of each case's history. *Fletcher*, 335 Ill. App. 3d at 450-52. In finding prejudice, the appellate court noted that the State's evidence consisted of testimony of accomplices who "needed to be viewed with great caution." *Fletcher*, 335 Ill. App. 3d at 455. Indeed, defense counsel's performance in *Fletcher* was so lacking that the appellate court treated it with unrestrained ridicule.

¶ 72　　The present case is a far cry from *Fletcher*. Nevertheless, we need not decide whether counsel's performance was deficient, because defendant cannot demonstrate that he was prejudiced. As noted, the totality of the evidence overwhelmingly proved defendant's guilt. When defendant took the witness stand, the jury already knew that he was a member of the Latin Kings and that the Latin Kings organization financed itself through crime. The jury had already heard from Hobson that defendant came to the Shell station armed. Through Cox's testimony, the jury knew that defendant picked the fight and displayed the gun. Keeney told the jury that defendant was waving the gun immediately after the shooting. The jury also knew that defendant and Hernandez fled the scene in tandem and that defendant hid from the police with the assistance of other members of the Latin Kings. The jury heard defendant's testimony and could reasonably have rejected it. Consequently, we determine that there is no reasonable probability that the result of the trial would have been different had the jury not been exposed to defendant's prior convictions.

¶ 73　　　　　　　　　D. The State's Reliance on Swanson's Prior Inconsistent
　　　　　　　　　　　　Statement in Rebuttal Argument

¶ 74　　When Swanson denied that defendant told her anything about how Hernandez got the gun, the State impeached her with her prior inconsistent statement. Then, in rebuttal closing argument, the prosecutor argued that Swanson admitted that "she told the detectives this defendant told her he took the gun out and gave it to [Hernandez]." The prosecutor argued that "[Swanson] told you the truth about what [defendant] said to her regarding this murder[,] and she told you about what this defendant said happened." Defendant maintains that the

prosecutor improperly used the prior inconsistent statement as substantive evidence in his rebuttal argument.

¶ 75    Prosecutors are given wide latitude in closing argument. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). However, a prosecutor cannot make arguments that have no basis in the evidence. *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008). Improper comments are not reversible error unless they are a material factor in the conviction or cause substantial prejudice to the defendant. *Meeks*, 382 Ill. App. 3d at 84.

¶ 76    Here, the State concedes that the State's argument was improper. Indeed, we have already determined that Swanson's prior inconsistent statement was not admissible as substantive evidence because she had no personal knowledge of the event. Consequently, we agree with defendant that the prosecutor's comments were improper. See *People v. Emerson*, 97 Ill. 2d 487, 501 (1983) (improper for the State to reference a prior consistent statement in closing argument where the statement was not admissible).

¶ 77    Because the issue was not preserved for review, defendant urges that it amounted to plain error. Defendant also asserts that counsel rendered ineffective assistance for failing to object to the comments. We find no plain error. As noted, under the plain-error doctrine, a forfeited error is reviewable when (1) the evidence is closely balanced or (2) the error is so fundamental and of such magnitude that the defendant was deprived of a fair trial. *People v. Williams*, 193 Ill. 2d 306, 348-49 (2000). As discussed above, the evidence was not closely balanced. Further, the prosecutor's improper comments were not repeated, and the jury was instructed to consider prior inconsistent statements only as affecting the weight of the witness's testimony. Consequently, the comments did not render the trial unfair under the second prong of the plain-error analysis. For the same reasons, we also hold that defendant was not prejudiced, so there was no ineffective assistance of counsel.

¶ 78                    E. Proof of Guilt of Unlawful Possession of a Firearm
                                      by a Street Gang Member

¶ 79    Defendant argues that the State failed to prove that the Latin Kings are a "street gang" as defined by the Illinois Streetgang Terrorism Omnibus Prevention Act (Act) (740 ILCS 147/10 (West 2012)). Defendant was charged with unlawful possession of a firearm by a street gang member in violation of section 24-1.8(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/24-1.8(a)(1) (West 2012)). A person violates that section when he or she (1) knowingly possesses, carries, or conceals on or about his person a firearm while on any street, road, alley, gangway, sidewalk, or other lands, except when inside his or her own abode or fixed place of business; (2) has not been issued a valid firearms owner's identification (FOID) card; and (3) is a member of a "street gang." "Street gang" is defined as "any combination *** of 3 or more persons with an established hierarchy that, through its membership or through the agency of any member engages in a course or pattern of criminal activity." 740 ILCS 147/10 (West 2012). "Course or pattern of criminal activity" means two or more gang-related criminal offenses committed when (1) at least one such offense was committed after January 1, 1993; (2) both or all offenses were committed within five years of each other; and (3) at least one offense involved the solicitation to commit, conspiracy to commit, attempt to commit, or commission of any felony. 740 ILCS 147/10 (West 2012).

¶ 80    Relying on *People v. Lozano*, 2017 IL App (1st) 142723, defendant argues that the State failed to prove a "course or pattern of criminal activity" and, therefore, failed to prove that the

Latin Kings are a street gang. The State has the obligation to prove every essential element of the crime beyond a reasonable doubt. *Lozano*, 2017 IL App (1st) 142723, ¶ 30. As noted, when the defendant challenges the sufficiency of the evidence, we must determine whether any rational trier of fact, after viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *Lozano*, 2017 IL App (1st) 142723, ¶ 28. The reviewing court must draw all reasonable inferences in the State's favor. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 81    In *Lozano*, the court reversed the defendant's conviction of unlawful possession of a firearm by a street gang member where the State failed to establish a specific time frame during which the gang committed its crimes. *Lozano*, 2017 IL App (1st) 142723, ¶¶ 41-44. Presiding Justice Gordon dissented, in part on the basis that the State's gang expert testified in the present tense that the gang's violence included forcible felonies. *Lozano*, 2017 IL App (1st) 142723, ¶ 55 (Gordon, P.J., dissenting). The dissent concluded that whether the expert's testimony referenced current events or historical facts was for the jury to decide and that it was free to interpret the testimony as applying to the present time. *Lozano*, 2017 IL App (1st) 142723, ¶ 55 (Gordon, P.J., dissenting).

¶ 82    Here, Dammon testified as the State's gang expert. Dammon explained the Latin Kings' and Surenos 13's histories, hierarchies, structures, symbols, signs, dress, and tattoos. Dammon testified that "gang banging" occurs when members are doing actual gang work, such as committing crimes for the prosperity or benefit of the gang, rather than "hanging out." According to Dammon, guns are very important to gangs, as gangs' primary income is from drug sales. He testified that gangs need weapons to protect their drugs, cash, and members from rival gangs. Dammon explained that "gang banging" also means fighting rival gangs "as well as intimidation of people. Anything to benefit the gang itself." Dammon opined, without objection, that the Latin Kings are a street gang as defined by Illinois law. He identified defendant as a current member of the Latin Kings.

¶ 83    Defendant maintains that, as in *Lozano*, the State's proof fails because Dammon did not testify to a time frame or, indeed, to any specific historical crime committed by the Latin Kings. The State urges us to adopt Presiding Justice Gordon's dissent. However, in *People v. Jamesson*, 329 Ill. App. 3d 446, 460 (2002), this court held that an expert on gangs may opine on the ultimate issue of whether an organization is a street gang engaged in a course or pattern of criminal activity without testifying to specific dates or incidents. Here, Dammon testified to the organizational structure of street gangs in general, and the Latin Kings in particular, and he opined that the Latin Kings are a street gang within the meaning of Illinois law. That opinion alone was sufficient to establish the element that the Latin Kings are a street gang. Further, Dammon testified in the present tense that gangs use guns to protect their drugs, cash, and members from rival gangs and that members do whatever is needed to benefit the gang, including intimidation of people. We believe that the jury could have reasonably inferred from Dammon's testimony that the Latin Kings historically and currently commit felonies. Accordingly, we hold that the State proved defendant's guilt of unlawful possession of a firearm by a street gang member beyond a reasonable doubt.

¶ 84         F. Whether Section 24-1.8(a)(1) of the Code Is Unconstitutional

¶ 85    Defendant contends that section 24-1.8(a)(1) of the Code, which makes it unlawful for a street gang member who does not have a FOID card to possess a firearm, unconstitutionally

criminalizes a defendant's status as a street gang member in violation of the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). The constitutionality of a statute is an issue of law, which we review *de novo*. *People v. Brown*, 2017 IL App (1st) 150146, ¶ 26. The party challenging the constitutionality of a statute has the burden to clearly establish that the statute violates constitutional protections. *Brown*, 2017 IL App (1st) 150146, ¶ 26. Statutes carry a strong presumption of constitutionality, and courts have a duty to uphold a statute's constitutionality whenever it is reasonably possible to do so. *Brown*, 2017 IL App (1st) 150146, ¶ 26. Consequently, all doubts are construed in favor of a statute's constitutionality. *Brown*, 2017 IL App (1st) 150146, ¶ 26.

¶ 86    In *Robinson v. California*, 370 U.S. 660, 666 (1962), the United States Supreme Court struck down a California statute making it a criminal offense for a person to be addicted to narcotics. In so holding, the Court noted that the statute punished a person not for the use, purchase, sale, or possession of narcotics, but for the status of being a narcotics addict. *Robinson*, 370 U.S. at 666. The Court commented that criminalizing a disease inflicted cruel and unusual punishment. *Robinson*, 370 U.S. at 666. In *Powell v. Texas*, 392 U.S. 514, 532 (1968), the Court refused to extend *Robinson* to a claim that the defendant's conviction of public drunkenness violated the eighth amendment because the defendant was convicted not for being an alcoholic, but for being in public while drunk on a particular occasion. Thus, the challenged statute in *Powell* punished an illicit act rather than a person's status. See *Farber v. Rochford*, 407 F. Supp. 529, 534 (N.D. Ill. 1975). In *Farber*, the court struck down a Chicago ordinance declaring it unlawful for a habitual drunkard, narcotics addict, or known prostitute to congregate with other persons of those classes, holding that such laws look "towards the status of the suspect rather than his conduct as the determinative factor of guilt." *Farber*, 407 F. Supp. at 533.

¶ 87    Here, defendant argues that section 24-1.8(a)(1) punishes his status as a gang member. Defendant relies on *City of Chicago v. Youkhana*, 277 Ill. App. 3d 101 (1995). In *Youkhana*, a city ordinance proscribed loitering by persons known to the police to be street gang members. *Youkhana*, 277 Ill. App. 3d at 104. The appellate court held that the ordinance violated the eighth amendment because it prohibited gang members from loitering solely because they were gang members. *Youkhana*, 277 Ill. App. 3d at 113. Defendant argues that, as in *Youkhana*, section 24-1.8(a)(1) is triggered only by his status as a gang member. Therefore, he concludes, section 24-1.8(a)(1) punishes only his status.

¶ 88    We distinguish *Youkhana* without opining on *Youkhana*'s dubious assumption that street gang membership is a status. *Robinson* and *Powell* were concerned with recognized diseases, not voluntary criminal associations. Be that as it may, as in *Powell*, section 24-1.8(a)(1) punishes an illicit act—the possession of a firearm without a FOID card. Possession is an act, not a status or a condition. *People v. Nettles*, 34 Ill. 2d 52, 56 (1966). In *Nettles*, the defendant was convicted of possession of narcotics. *Nettles*, 34 Ill. 2d at 53. The defendant argued that the statute criminalizing possession of narcotics, when applied to a known narcotics addict, violated the eighth amendment. *Nettles*, 34 Ill. 2d at 56. Our supreme court handily rejected that argument, noting that possession is a voluntary act. *Nettles*, 34 Ill. 2d at 56. Accordingly, we hold that section 24-1.8(a)(1) is constitutional.

¶ 89                    G. Propriety of the Aggregate 60-Year Sentence

¶ 90        Defendant contends that his aggregate 60-year sentence of incarceration does not reflect his youth, rehabilitative potential, and marginal culpability. Defendant also contends that the sentence is disproportionate to the 60-year sentence given to the shooter, Hernandez. See *Hernandez*, 2017 IL App (2d) 141104-U, ¶ 16. Defendant urges this court to reduce his aggregate sentence to 38 years' incarceration. The trial court has broad discretion when imposing a sentence, and its sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This court cannot alter a sentence pursuant to Illinois Supreme Court Rule 615(b) (eff. Jan. 1, 1967) unless the trial court abused its discretion. *People v. Vasquez*, 2012 IL App (2d) 101132, ¶ 68. An abuse of discretion occurs when a sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Vasquez*, 2012 IL App (2d) 101132, ¶ 68.

¶ 91        The sentencing range for first degree murder is 20 to 60 years' incarceration. 730 ILCS 5/5-4.5-20(a) (West 2012). Because the jury found that defendant was armed with a firearm during the commission of the offense, a mandatory 15-year enhancement applied. 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2012). A conviction of unlawful possession of a firearm by a street gang member carries a range of incarceration from 3 to 10 years. 720 ILCS 5/24-1.8(b) (West 2012). Here, the court sentenced defendant to 35 years' imprisonment for first degree murder, and then added the mandatory 15-year enhancement. As noted, the court merged the conviction of aggravated unlawful use of a weapon into the conviction of unlawful possession of a firearm by a street gang member, and sentenced defendant to a consecutive 10 years' incarceration on that charge. Thus, the aggregate sentence was within statutory limits.

¶ 92        Nevertheless, defendant maintains that the sentence was an abuse of discretion because of his youth and rehabilitative potential. Defendant was 21 years old at the time of the murder. He had been adjudicated delinquent for residential burglary and sentenced to the Illinois Department of Corrections, juvenile division. As an adult, defendant had convictions of driving under the influence, felony obstruction of justice (for which he was sentenced to one year of incarceration), misdemeanor attempted obstruction of justice, and aggravated battery. Defendant was unemployed and was a member of a street gang. At sentencing, he expressed no remorse or regret.

¶ 93        Although defendant downplays his participation in Herman's murder, the jury rejected his version of the event. The evidence showed that defendant went to the Shell station armed and then instigated the confrontation with Cox. Defendant intimidated Cox by accusing him of gang banging and by displaying the gun in his belt. Immediately after the shooting, defendant was waving the gun, and then he and Hernandez fled. For the next three weeks, defendant was a fugitive. Killing Herman was no act of youthful derring-do. It was, as the court noted, a senseless killing. As the videos taken from defendant's phone depict, defendant was a dedicated street gang member. The act, defendant's criminal history, and his lack of remorse show little, if any, rehabilitative potential.

¶ 94        Defendant also argues that his sentence was excessive as compared to Hernandez's sentence because (1) Hernandez was eligible for a greater sentence than defendant, as he was subject to a mandatory 25-year enhancement for his first degree murder conviction, and (2) as a mere accomplice, defendant should receive a lesser sentence than the shooter. Hernandez was sentenced to a 55-year term of incarceration for first degree murder with a consecutive 5-year term for unlawful possession of a firearm by a street gang member. *Hernandez*, 2017 IL

App (2d) 141104-U, ¶ 16. Defendant asserts that Hernandez grabbed the gun from defendant, who was acting as a peacemaker. As noted, the jury reasonably rejected that scenario. The evidence overwhelmingly demonstrated that defendant was the only one who was initially armed and that he was the prime aggressor. Accordingly, for all of the above reasons, we hold that the court did not abuse its discretion in sentencing defendant to an aggregate term of 60 years' incarceration.

¶ 95                          H. Additional Credit Against the Sentence

¶ 96        Finally, defendant contends that he is entitled to an additional two days of credit against his sentence. The mittimus reflects a credit of 731 days. According to defendant, that figure was a miscalculation, as he spent 733 days in custody awaiting trial. The State concedes this argument. Accordingly, we correct the mittimus to reflect a credit of 733 days.

¶ 97                                    III. CONCLUSION

¶ 98        For the foregoing reasons, the judgment of the circuit court of Boone County is affirmed as modified. We grant the State's request for statutory State's Attorney fees pursuant to *People v. Nicholls*, 71 Ill. 2d 166 (1978).

¶ 99        Affirmed as modified.